IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBIN K. FICKER,                                  :

     Plaintiff,                                   :

v.                                               :         Civil Action No. GLR-21-769

TALBOT COUNTY, MARYLAND,                          :

     Defendant.                                   :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff Robin K. Ficker's Second Motion for Preliminary Injunction (ECF No. 15). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the Motion.

## I.      BACKGROUND

Plaintiff Robin K. Ficker is a declared Republican candidate for Maryland's 2022 gubernatorial primary, which will take place in June 2022. (Am. Compl. ¶ 4, ECF No. 11). After announcing his campaign in March 2020, Ficker distributed campaign signs to various property owners throughout the state of Maryland, including residents of Defendant Talbot County, Maryland ("Talbot County" or the "County") who live along U.S. Route 50 ("Route 50"). (Id. ¶¶ 6, 7). Talbot County residents displayed Ficker's campaign signs along Route 50 without incident until January 15, 2021, when the County issued a "Temporary Sign Violation/Order to Abate" ("Abatement Order") advising residents that the yard signs violated Talbot County Code. (Id. ¶ 9). Specifically, the

Abatement Order indicated that Talbot County Code § 190-42.4(A) and Table V-9(9)(c) (together, the "Ordinance") prohibited the display of campaign signs more than sixty days before the primary election. (Id. ¶¶ 11–12).

On March 25, 2021, Ficker initiated the present action against the County, alleging that the Ordinance's durational limit on political signs burdened his rights under the First and Fourteenth Amendments of the United States Constitution. (ECF No. 1). Ficker also filed a Motion for Preliminary Injunction, which sought to enjoin the County from enforcing the Ordinance's duration limits on political signs during the pendency of this lawsuit. (ECF No. 2).

In response, on May 4, 2021, the Talbot County Council adopted an Administrative Resolution barring enforcement of the Ordinance's durational limits as they pertained to election yard signs displayed on private property. (Am. Compl. ¶ 19; see also Administrative Resolution, ECF No. 17-1). In light of the Administrative Resolution, the Court denied Ficker's Motion for Preliminary Injunction on the grounds that he was unable to show irreparable harm. (See May 21, 2021 Order, ECF No. 10).

On May 5, 2021, the day after the Talbot County Council passed the Administrative Resolution, the County sent a letter (the "May 5, 2021 Letter") to the property owners who received the County's January 15, 2021 Abatement Order. (Am. Compl. ¶ 20; see also May 5, 2021 Letter, ECF No. 17-2). The May 5, 2021 Letter explained that although the County was suspending enforcement of the sixty-day durational limits on political yard signs, the Ordinance's other restrictions remained in full effect. (Id.; May 5, 2021 Letter at 1). In particular, the Letter instructed each property owner that the Ficker yard signs, which

measure thirty-two feet square feet, were "too large for the zoning district in which your property is located." (Id. ¶¶ 21–22; see also May 5, 2021 Letter at 1).

On May 21, 2021, Ficker filed an Amended Complaint adding allegations that the Ordinance's size limits on political signs unconstitutionally interferes with and unlawfully restricts his First and Fourteenth Amendment rights. (Am. Compl. ¶¶ 34–37). Ficker then filed a Second Motion for Preliminary Injunction, which requested the Court to enjoin the County from enforcing the Ordinance's size limitations on campaign signs. (ECF No. 15). Specifically, Ficker requests an injunction of the Ordinance to the extent it "prohibit[s] the erection of Plaintiff's campaign signs that are larger than six square feet on private property in conservation, residential, or village districts on Route 50." (Pl.'s 2nd Mot. Prelim. Inj. at 1–2 ["2nd PI Mot."], ECF No. 15-1). The County filed its Opposition on June 17, 2021. (ECF No. 17). Ficker filed his Reply on July 2, 2021. (ECF No. 18).

## II.    DISCUSSION

In order to be entitled to preliminary injunctive relief, a plaintiff must show (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, the balance of hardships and public interest factors merge. Nken v. Holder, 556 U.S. 418, 435 (2009). Additionally, the plaintiff's likelihood of success is frequently the determinative factor in First Amendment cases. Pursuing America's Greatness v. Fed. Election Comm'n, 831 F.3d 500, 511 (D.C. Cir. 2016). The Court analyzes these elements in turn.

A.   <u>**Likelihood of Success**</u>

To evaluate the constitutionality of a statute under the First Amendment, the Court must first ask whether the it burdens speech or conduct. <u>See</u> <u>Arlington Cnty. Republican Comm. v. Arlington Cnty.</u>, 983 F.2d 587, 593 (4th Cir. 1993). If the statute imposes any burden on speech, the court must then determine whether the statute's restrictions are content neutral or content based. <u>Id.</u> Government regulation of speech is content based if: (1) the "law applies to particular speech because of the topic discussed or the idea or message expressed"; or (2) the law cannot be "justified without reference to the content of the regulated speech," or was "adopted by the government because of disagreement with the message [the speech] conveys." <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 163–64 (2015) (alteration in original) (internal quotation marks and citations omitted). Content-based ordinances are subject to strict scrutiny and "presumptively violate" the First Amendment. <u>See</u> <u>City of Renton v. Playtime Theaters, Inc.</u>, 475 U.S. 703, 720 (1986). By contrast, content-neutral regulations receive "intermediate scrutiny," meaning they pass muster if they are "narrowly tailored to serve a significant government interest" and "leave open ample alternative channels for communication." <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984).

Here, there is no dispute that the Ordinance burdens speech rather than conduct. <u>See</u> <u>Arlington Cnty. Republican Comm.</u>, 983 U.S. at 593–94 ("Communications by signs and posters are virtually pure speech." (citation omitted)). Further, the County concedes that the Ordinance is a content-based restriction because it imposes different limitations on types of temporary signs based on "the topic discussed or the idea or message expressed."

(Def.'s Resp. Opp'n Pl.'s 2nd PI Mot. ["Opp'n"] at 6–7, ECF No. 17 (quoting Reed, 576 U.S. at 163)). Accordingly, the Ordinance is subject to strict scrutiny, which "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" Reed, 576 at 171 (internal quotation marks and citation omitted). In other words, the County must demonstrate that the Ordinance's limitations on size of political signs on private property (1) furthers a compelling governmental interest and (2) is narrowly tailored to that end. See id.

Here, the County contends the purpose of the Ordinance is to "minimize[e] for aesthetic reasons the proliferation of visual clutter caused by temporary signs" and to "promot[e] traffic safety" by reducing signs that "may obstruct views and distract motorists." (Opp'n at 7). The United States Supreme Court has previously held that the government "might reasonably view the general regulation of signs as necessary because signs 'take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation.'" Reed, 576 U.S. at 173 (quoting City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994)). Critically, though, the Fourth Circuit has indicated that "[a]lthough interests in aesthetics and traffic safety may be 'substantial government goals,' neither we nor the Supreme Court have ever held that they constitute compelling government interests." Cent. Radio Co. v. City of Norfolk, 811 F.3d 625 (4th Cir. 2016) (citations omitted). Thus, at this stage, the County has not proffered a compelling government interest.

Further, even if the Court were to assume that the County's asserted interests provided compelling justification for its content-based restrictions of speech, it does not

appear that the Ordinance was narrowly tailored to serve those interests. In Talbot County, temporary signs "are permitted without a sign permit" but are subject to certain requirements depending on their classification under Table V-9. (See Ordinance at 1, ECF No. 17-3). Table V-9 designates ten different types of temporary signs that are categorized by their content.[1] (See id. at 1–3). Ficker's temporary political signs are considered to fall into the ninth category, which is for "temporary signs related to an upcoming event" ("Type 9 Signs"). As to Type 9 Signs, Table V-9 provides that the maximum area per sign is six square feet for conservation, residential, and village districts; fifty square feet for a limited commercial district; and one hundred square feet in general commercial and light industrial districts. (Id. at 3). In other words, the restrictions on the size of Type 9 Signs depend on the zoning of the property on which the sign is displayed. Here, all of the properties that displayed Ficker's signs are zoned as conservation, residential, or village district. (See Opp'n at 11 n.5). Accordingly, the six square foot limit applies to the signs at issue here.

By contrast, Table V-9 identifies certain types of signs that may be larger than six square feet. These include "[d]ecorative flags and buntings" ("Type 6 Signs") and "[s]igns advertising produce stands" ("Type 8 Signs"). (Ordinance at 2). Still, these types of signs

---

[1] The ten categories are: real estate signs ("Type 1 Signs"); construction site identification signs ("Type 2 Signs"); temporary window signs ("Type 3 Signs"); displays erected in connection with the observance of County, state, or federally recognized holidays ("Type 4 Signs"); special event signs ("Type 5 signs"); decorative flags and buntings ("Type 6 Signs"); signs identifying agricultural test plots ("Type 7 Signs"); signs advertising produce stands ("Type 8 Signs"); other temporary signs related to an upcoming event ("Type 9 Signs"); and temporary signs not covered in the foregoing categories ("Type 10 Signs"). (See Ordinance at 1–3).

are subject to additional restrictions that do not apply to Type 9 Signs. Although Type 6 Signs have a maximum area of eight square feet, they must be "[a]ttached to a building façade or to a flagpole no more than 15 feet high" and "not to a roof"; may only be erected for sixty days; and cannot advertise a product or business. (Id.). Further, as to Type 6 Signs, there may be "[n]o more than two flags or buntings per lot." (Id.). Likewise, although Type 8 Signs may be larger than six square feet, Table V-9 provides that produce stands "located on property abutting US Route 50" are limited to only two signs—"[o]ne flat wall sign not to exceed 50 square feet in area" and "[o]ne freestanding sign not to exceed 64 square feet in area"—whose "cumulative sign area shall not exceed 82 square feet." (Id. at 2–3). For "all other [produce] stands," each stand may have "one flat wall sign not to exceed 50 square feet in area; and one freestanding sign not to exceed 32 square feet in area." (Id. at 3). Additionally, all Type 8 Signs must "be removed when the produce stand is not operating." (Id.).

Finally, some types of signs identified in Table V-9 are subject to no size limits at all. These include displays, including lighting, "erected solely in connection with the observance of County, state, or federally recognized holidays" ("Type 4 Signs") and "special event signs" which "provide information on a grand opening, fair, carnival, circus, festival, or similar event" ("Type 5 Signs"). (Id. at 2). Type 4 Signs must be removed within ten days following the holidays. (Id.). Additionally, Type 5 is limited to signs that "provide information" about an event that "[t]akes place on the lot where the sign is located"; "[r]uns not longer than two weeks"; and "[i]s unlike the customary activities associated with the property where the special event is to be located." (Id.).

At bottom, although the Ordinance burdens other sign types with limits on size, purpose, duration, number, or placement, it is not clear at this stage why the six-square-foot limitation is necessary for Type 9 Signs but not for Types 4, 5, 6, and 8. Certainly, if the County is primarily concerned with aesthetics and traffic safety, those concerns would similarly apply to flags and buntings, signs for produce stands, holiday displays, and special event signs. In particular, the Court cannot discern any reason why temporary political signs along Route 50 must be limited to six square feet while a sign for a produce stand along the same roadway may measure up to sixty-four square feet. Likewise, holiday displays and signs for special events—which are subject to no size limitations whatsoever—could cause just as much if not significantly more visual clutter or distraction to motorists than a six-square-foot campaign sign. Further, the Court sees no reason why temporary political signs are limited to six square feet in conservation, residential, and village districts but can be as large as fifty square feet in a limited commercial district or up to one hundred square feet in general commercial and light industrial districts. Once again, the Court would assume that concerns with aesthetics and traffic safety would be applicable regardless of the zoning district in which the signs are displayed. In all, the County "cannot claim that placing strict limits on [certain] signs is necessary . . . while at the same time allowing . . . other types of signs that create the same problem." Reed, 576 U.S. at 172; see also Cent. Radio, 811 F.3d at 634 (concluding that types of flag subject to strict size and number limitations were "no greater an eyesore" than the types that were permitted in "unlimited proliferation").

Although the County concedes that the Ordinance is a content-based restriction, (see Opp'n at 6–7), it simultaneously contends that the Ordinance is one of the permissible content-neutral restrictions identified by Justice Alito in his concurrence in <u>Reed</u>. The County is generally correct that <u>Reed</u> did not stand for the principle that "municipalities are powerless to enact and enforce reasonable sign regulations"—indeed, Alito's <u>Reed</u> concurrence suggested that rules regulating the size of signs may be considered content-neutral. <u>See Reed</u>, 576 U.S. at 174 (Alito, J., concurring) (observing that "[r]ules regulating the size of signs" are a type of rule "that would <u>not</u> be content based" (emphasis added)). However, the Ordinance here is not purely a content-neutral size restriction that applies equally to all signs regardless of content. Rather, the Ordinance imposes varying size limitations based upon the sign's subject matter. Thus, while it is possible for a government to regulate the size of signs in a way that does not trigger strict scrutiny, the Ordinance here does not accomplish that goal.

For these reasons, it appears that the Ordinance is "hopelessly underinclusive" in that "it leav[es] appreciable damage to [the government's] interest unprohibited" by strictly regulating the size of Type 9 Signs as compared to other types. <u>See Reed</u>, 576 U.S. at 171–72 (internal quotation marks and citation omitted). Accordingly, at this stage, the Court cannot find that the Ordinance is narrowly tailored to meet a compelling government interest. Because it appears that the County lacks a compelling government interest for the Ordinance and the Ordinance is not narrowly tailored, Ficker has satisfied his burden of demonstrating a likelihood of success on the merits of his claim.

**B.**   **Irreparable Harm**

To be awarded a preliminary injunction, after showing a likelihood of success on the merits, a plaintiff must demonstrate that "irreparable injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22 (citations omitted). Here, Ficker contends he will suffer irreparable harm if the County is permitted to continue enforcing the Ordinance because it "prevents the generation of grass roots support in Talbot County," deprives Ficker "of the opportunity to showcase his support to Marylanders traveling to Ocean City during the beach season," and "severely restrains Ficker's opportunity to demonstrate his support among Talbot County voters." (2nd PI Mot. at 17–18). At this stage, the Court finds these arguments persuasive. Continued enforcement of the Ordinance would not only severely limit Ficker's political speech, but also permanently deprive him of the opportunity to generate robust exposure in Talbot County in the months leading up to Maryland's gubernatorial primary in June 2022. As such, this element is plainly satisfied.

For its part, the County argues that Ficker would not suffer any harm due to continued enforcement of the Ordinance because his supporters could display unlimited six-square-foot signs along Route 50 or, alternatively, Ficker could display larger signs in limited commercial, general commercial, and light industrial zoning districts. The Court is not persuaded. As Ficker points out, it is likely that drivers traveling along Route 50 would not be able to read or meaningfully comprehend a six-square-foot yard sign. (<u>See</u> Pl.'s Reply Mem. L. Further Supp. 2nd PI Mot. ["Reply"] at 5, ECF No. 18). Further, erecting campaign signs in limited commercial, general commercial, and light industrial zoning districts would not further Ficker's interest in promoting his political speech along the well-

traveled stretch of Route 50 in Talbot County. (Id. at 5–6). For these reasons, the Court agrees with Ficker that the loss of political exposure is sufficient to show irreparable harm.

## C.      Balance of Equities & Public Interest

As noted above, because the County is a government defendant, the third and fourth factors must be analyzed together. See Nken, 556 U.S. at 435. Here, the County's contends it has an interest in enforcing the Ordinance because "its citizens stand to suffer substantial injuries if Plaintiff is granted a preliminary injunction." (Opp'n at 18). In particular, the County asserts that granting Ficker's requested injunctive relief would "severely curtail[ ]" the County's ability to regulate the size of temporary signs along Route 50, meaning that "any citizen in the County could erect a sign of any size to comport with his or her own desires." (Id. at 18, 19). Further, the County posits that "larger signs . . . create unforeseen traffic and safety concerns." (Id. at 18).

The Court is not persuaded. First, as Ficker notes, although his thirty-two-square-foot campaign signs remained in place from April 2020 until January 15, 2021, the County does not offer any evidence that additional traffic or safety issues occurred during that nine-month period. (See Reply at 3). Additionally, as discussed above, any assertion that signs larger than six square feet are likely to cause traffic accidents is undermined by the fact that the Ordinance permits much larger signs to be displayed along Route 50.[2] Second,

---

[2] On this point, Ficker offers testimonial evidence that he has undertaken two driving trips along Route 50 in Talbot County, during which he has observed a variety of temporary signs that were the same size or larger than his campaign signs. (See 2nd PI Mot. at 6–7; see also Ficker Aff. ¶¶ 20–30, ECF No. 15-2). Because the Court finds that Ficker has satisfied his burden at this stage, the Court need not consider this evidence at this time.

despite the County's concern that property owners may erect massive signs, the Court is confident that Ficker's requested injunctive relief is narrow enough to avoid this result. (See Reply at 1 (clarifying that Ficker only intends to display his existing thirty-two-square-foot campaign signs)). Further, the Supreme Court has generally dismissed concerns of this nature due to residents' "strong incentives to keep their own property values up and to prevent 'visual clutter' in their own yards and neighborhoods." Gilleo, 512 U.S. at 58. And in any event, the procedural history of this case demonstrates that, if needed, the County is capable of promptly passing an Administrative Resolution to regulate such conduct. (Cf. Administrative Resolution at 1 (staying enforcement of the Ordinance just forty days after Ficker filed suit)). For these reasons, the County's stated interest in enforcing the Ordinance both speculative and relatively weak.

By contrast, there is a strong public interest in permitting Ficker to exercise his political speech through yard signs. It is well-established under First Amendment jurisprudence that "[p]olitical speech is entitled to the highest degree of constitutional protection." Wash. Post v. McManus, 355 F.Supp.3d 272, 285 (D.Md.), aff'd, 944 F.3d 506 (4th Cir. 2019); see also Arlington Cnty. Republican Comm., 983 F.2d at 593 ("The Supreme Court consistently afford more protection to political speech than commercial speech."). In addition, the Supreme Court has also recognized the particular importance of residential yard signs in conveying political messages. See Gilleo, 512 U.S. at 56 ("Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the

'speaker," . . . [which] is an important component of many attempts to persuade."). Because "upholding constitutional rights serves the public interest," <u>Newson ex rel. Newson v. Albermarle Cnty. Sch. Bd.</u>, 354 F.3d 249, 261 (4th Cir. 2003), the third and fourth factors weigh heavily in favor of Ficker.

In sum, Ficker has demonstrated at this stage that he is likely to succeed on the merits of his First Amendment claim; he will suffer irreparable harm under continued enforcement of the Ordinance; and the equities and public interest weigh strongly in his favor. Accordingly, the Court will grant Ficker's Second Motion for Preliminary Injunction and enter his requested injunctive relief—that is, to enjoin the County from enforcing the Ordinance "so as to prohibit the erection of Plaintiff's campaign signs that are larger than six square feet on private property in conservation, residential, and village districts" during the pendency of this litigation. (2nd PI Mot. at 1–2).

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Ficker's Second Motion for Preliminary Injunction (ECF No. 15). A separate Order follows.

Entered this 11th day of August, 2021.


_____/s/_____
George L. Russell, III
United States District Judge